# MARCH 18, 1942

## J. R. GALLAGHER v. THE STATE.

No. 21872. Delivered January 21, 1942.
Rehearing Denied March 18, 1942.

The opinion states the case.

*W. R. Parker,* of Fort Worth, and *Howard C. Davidson,* of Rotan, for appellant.

*Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

Appellant was convicted of murder without malice and sentenced to two years confinement in the State penitentiary.

It is presented by the State's testimony that the victim of the homicide was a negro named George Maberry, commonly known as "Bombsie," who resided in a section of the City of Rotan, Fisher County, known as "The Flat." Appellant is a white man. At about midnight on September 17, 1940, it is stated that appellant went to the house of "Bombsie," aroused him from his sleep and, after a very few words which are not repeated in the record, shot him three times, killing him instantly.

It appears from the State's evidence also that deceased lived in a small "shotgun" house and that on the night of the

homicide he was occupying a bed with two negro women who were visiting him and who testified in the case that they had been asleep, with "Bombsie" in the middle of the bed between them, for two or three hours prior to the killing. Two other witnesses, a negro man and his wife, occupied the back room of the house and testified that through a large crack in the door between the rooms they saw a light flash on, heard a conversation which was not audible to them, and heard the shots fired which resulted in the death of the negro. Immediately thereafter the appellant, upon leaving the place, contacted other parties, some of them officers, to whom he made the statement that he had killed Maberry, giving as his reasons for it that he had insulted his wife and that when appellant approached him for an explanation "Bombsie" reached as if to get a weapon to attack appellant and that appellant then shot him. Such res gestae statements are relied upon by appellant to sustain his plea of self defense.

Appellant did not testify himself, but his wife gave quite a spectacular narration of events of the preceding day leading up to the shooting by which it is claimed that around noon appellant and the deceased came to the home of the witness and appellant, who resided in a house improvised from an old street car cut into three rooms. As we understand her testimony, her husband went to sleep in the middle part of the "house" while the negro visited there about two o'clock in the afternoon and during this time made an indecent proposal to the wife of appellant by which he offered to pay her $500.00 if she would agree to make certain visits with him. This offer was refused and while she had her baby in her lap the deceased took hold of her dress in the collar and shoved her around in an effort to frighten her into submission. The dress was exhibited by the witness. She made no outcry and did not awaken her husband because she was afraid there would be trouble. The husband and deceased later left the house. Her two sisters came to visit and about nightfall the deceased returned with a deputy constable and, approaching the rear door, forced his way into the house over her protest and, in the presence of her two sisters, again insisted on her accepting his offer made during the day and also made some additional threats. Something was said about his returning at night and whistling for her. The husband returned home later and went to sleep. Something like an hour or less before the homicide the witness, who was nervous and awake, heard whistling and saw the deceased drive up to the house in an automobile. She became frightened

and woke her husband, got a pistol and rushed to the door, but deceased made his get away. The husband then demanded to know what the trouble was and expressed the fear to his wife that she was crazy. She finally told him the greater part of the happenings preceding that hour in explanation of her fright. The husband, in response, pacified his wife by telling her that he would take the gun and go to "Bombsie's" home and get an explanation, or an apology, and tell him not to come back and bother her any more. He went in the direction of where deceased lived, which was only about four blocks away, and soon the wife heard pistol shots. In a few minutes appellant returned to the house with the officers and reported the happening. The two sisters and the deputy constable testified in behalf of appellant, giving statements somewhat in corroboration of what the wife said occurred when deceased came to the house with the deputy constable.

It will be observed that there is no testimony denying the res gestae statements of appellant as to the threatening acts and conduct of the deceased, but the possibility of the deceased's visit to the premises of appellant at the late hour of the night, as detailed by the wife, is denied by the evidence given by the two women asleep there, above referred to. Unless there is error in the court's charge or in the admission of the evidence, the verdict of the jury should stand.

The court gave a very exhaustive charge and we think a well considered one. Appellant filed lengthy exceptions to practically every paragraph of it and also presents a bill of exception which complains of a question asked the witness Willis Adams. From the bill it appears that the witness was asked if he knew "Bombsie" and whether or not he had ever seen him at the defendant's house, to which he answered that he had. The witness was then asked if he knew what the deceased was doing up there, to which he replied, "No, sir, I don't know his business." The district attorney then asked, "Did you ever buy any beer up there?" The very able counsel representing defendant objected to this question, which objection was sustained and the jury instructed not to consider it. It is insisted, however, in a well prepared brief that the asking of the question constituted error which could not be cured by the court's instruction. In doing so he has presented a question in a manner which has called for extensive investigation of authorities upon our part. General principles set out in the argument of the brief will be readily agreed to. It is a dangerous practice

for a prosecuting attorney to ask a question which could not in good faith be related to an issue before the court, but Childress v. State, 241 S. W. 1029, nor either of the other cases discussed in the brief will, in our opinion, sustain the conclusion which it is sought to draw from them and will not be applied to the facts of this case for the reason that the record fails to show any implication of an unlawful sale of whiskey at the home of appellant; fails to indicate any involvement of the appellant, but rather reflects on the deceased because he was the party the State was immediately inquiring about. Furthermore, another witness in the case who testified to having met appellant as he left the house after shooting "Bombsie" said he was going there to buy some wine, indicating that the deceased or someone in his home would be selling it. All of this was before the jury and we find no effort at any place to connect appellant with the question which the court excluded. So viewing it, there is no further necessity for an analysis of the authorities presented.

In Bill of Exception No. One, which contains many exceptions to the charge, several questions are raised, but we do not consider it necessary or enlightening to discuss the greater number of them. In the first paragraph of exceptions complaint is made of certain portions of the charge on the ground it is on the weight of the evidence and an assumption on the part of the court that there had been some previous relationship existing between the defendant and the deceased. As we review defendant's testimony it is replete with statements of a previously existing relationship between the defendant and the deceased and undenied by any one. The court's charge could hardly be couched in language to avoid such assumption and it is harmless.

In paragraph two of the exception complaint is made that paragraph six in the court's charge repeats certain portions of paragraph four of the charge to the harm of appellant. Inasmuch as these two sections are submitting the defendant's theory of the case and in his behalf we are unable to see why he would be injured by a repetition.

In several instances complaint is made of the court's charge relating to murder with malice. In view of the fact that the jury found him guilty of murder without malice, a consideration of such complaints will not be in order.

Objection is also found to paragraph eight of the court's charge on the ground of failure of the court to instruct the jury that the matter of self defense should be viewed from the standpoint of defendant and no other person, and did not charge on the appearance of danger from the standpoint of the defendant at the time. It is observed that this statement by the court was only incidental and that in paragraph twelve of the charge he gave a very fair and comprehensive charge on the law of self defense which should thoroughly satisfy this objection.

It is also complained in section 8A of the exception to the charge that the court committed error in paragraph fourteen in that he shifted the burden of proof from the State to the defendant and required the defendant to show beyond a reasonable doubt that the defendant entered the room of deceased and that deceased drew a knife on him. Considered in connection with other portions of the charge and in the language written, we think this paragraph is not subject to the complaint lodged against it. The court repeatedly charged on the law fixing the burden of proof beyond a reasonable doubt on the State and applied it to every issue in the case and, if the charge is subject to the construction that he failed to do so at any place, it is certainly a reasonable deduction that the jury could not misunderstand the language of the charge so as to conclude that the defendant had the burden as claimed. Admittedly, the court has some difficulty in a charge of this length in always repeating his instructions on the law of burden of proof. We see no necessity for his doing so in this charge.

Finding no error, the judgment of the trial court is affirmed.

## ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

Appellant, in his motion for a rehearing, first complains of the following statement in the original opinion as not justified by the evidence. "But the possibility of the deceased's visit to the premises of appellant at the late hour of night, as detailed by his wife, is denied by the evidence given by two women asleep there, above referred to." The evidence of the two women place deceased at his house up to eleven P. M., at which time they left said house. Deceased was in bed when they left. The homicide occurred at or soon after midnight. The home of the

deceased was only about four city blocks from that of appellant. After the women left the deceased could have gone to the home of appellant and returned to his own home before the killing occurred. We make the correction in deference to the complaint.

Appellant next contends that we erred in holding that the question of the District Attorney Willis to Adams if he ever bought any beer at appellant's house was not reversible error. The bill complaining of this matter shows that defendant objected before the witness gave any answer. The objection was sustained and the jury was instructed not to consider the question. Appellant insists, however, that the mere asking of the question was of such a prejudicial nature that the court could not effectively withdraw the same from their minds. We are unable to reach such a conclusion in the absence of any showing in the bill that it was a violation of the law to sell beer in Fisher County. The District Attorney should not have asked the question as it does not appear relevant or pertinent to any issue in the case, but under the facts disclosed by the bill reversible error is not shown.

Appellant objected to paragraph eleven of the court's charge on the ground that it was contradictory of other paragraphs of the charge, and shifted the burden of proof and confused the issue of self defense with the issue of a killing without malice. The language of said paragraph eleven is unhappily chosen and can not be approved. However, it is to be considered in connection with the preceding and succeeding paragraphs of the charge. In paragraph nine of the charge the court very fully and correctly tells the jury what constitutes murder without malice, defining "adequate cause" as found in our Penal Code, Art. 1257c. In paragraph ten the jury was told that if they believed from the evidence beyond a reasonable doubt that appellant killed deceased unlawfully and voluntarily, and not in self defense, but if they believed or entertained a reasonable doubt that at the time of the killing appellant's mind was inflamed from an adequate cause, the punishment assessed could not be for longer than five years in the penitentiary. Then follows paragraph eleven, criticism of which is renewed in appellant's motion for rehearing, and which will be adverted to presently. Paragraph twelve states the law of self defense, and application is made thereof in paragraph thirteen in which the jury was told that if deceased reached his hand under a pillow, and it reasonably appeared to appellant from the acts, words or conduct of deceased either alone, or in connection with all

other facts and circumstances in evidence that deceased was reaching for a weapon with which to kill or seriously injure appellant, and there was created a reasonable fear of death or serious bodily injury from deceased, and that appellant acting upon such reasonable fear, killed deceased, or if the jury had a reasonable doubt as to whether the killing occurred under such circumstances, they should acquit appellant.

Reverting now to paragraph eleven. It begins as though it were also intended as an instruction on self defense, hence, we think, the criticism. The jury was told that if deceased was in bed and reached his hand under the pillow as if to get a weapon, and it reasonably appeared to appellant that deceased was reaching for a weapon with which to kill or seriously injure appellant, and if from the acts, words and conduct of deceased at the time either alone or in connection with all other facts and circumstances in evidence, appellant's mind became inflamed to a degree which rendered him incapable of cool reflection, and he killed deceased while in such state of mind, but was not acting in self defense, his punishment could be for no longer than five years, if found guilty of murder. The charge concluded with an instruction that if the jury had a reasonable doubt as to whether appellant's mind was incapable of cool reflection to give appellant the benefit of the doubt, and not assess his punishment at more than five years, even though they should find him guilty of murder. The paragraph is involved to some extent, but if it is in any way erroneous as applicable to the punishment of murder without malice, the error would be harmless because the minimum punishment of only two years was assessed. The paragraph of the charge in question, when considered with the instructions as a whole, seems subject to the construction that although it may have appeared to appellant that deceased was reaching for a weapon with which to kill or seriously injure appellant, yet if appellant was not apprehensive that such a result would follow, but became enraged by what deceased was then doing, either from that alone, or in connection with other facts and circumstances in evidence, and appellant killed while in such state of mind it would be a killing without malice, and punishable only as such. The paragraph, we think, cannot be reasonably construed as a limitation upon appellant's right of self defense. Especially is this true when paragraphs 12, 13, 14 and 18 are taken into account, all of which are on the issue of self defense.

It is not to be understood that we approve the language

of paragraph eleven of the charge. It might be criticized from the State's standpoint as well as from that of appellant. Its language would indicate that if the things occurred as recited in the charge that an inflamed condition of appellant's mind resulted from adequate cause, instead of measuring it with the requirement that the same facts and circumstances would have produced that condition in the mind of a person of ordinary temper.

From what has been said it follows that we are of opinion appellant's motion for rehearing should be overruled, and it is so ordered.